IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

No. 23-5094

_____

HEIDI STIRRUP, et al,
Appellants

v.

UNITED STATES DEPARTMENT OF DEFENSE, et al,
Appellees.

_____

APPELLANTS' OPENING BRIEF

_____

Jeffrey E. McFadden (DC. Bar No. 434234)
LAW OFFICES OF
JEFFREY E. MCFADDEN, LLC
312 Prospect Bay Drive East
Grasonville, MD 21638
Phone: (443) 272-4737
jmcfadden@jmcfaddenlaw.com

Michael T. Rose (S.C. Bar #4910)
MIKE ROSE LAW FIRM, PC
409 Central Ave.
Summerville, SC 29483
Phone: (843) 871-1821
mike@mikeroselawfirm.com

Richard A. Epstein (CA Bar #43329)
16 Thomas Place
Norwalk, CT 06853
Phone: (773) 450-4476
raepstein43@gmail.com

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

The parties who appeared before the district court and who are appearing before this court are as follows.

Appellants:     Heidi Stirrup, personally and in her official capacity as a member of the United States Air Force Academy Board of Visitors

Douglas Lengenfelder, personally and in his official capacity as a member of the United States Air Force Academy Board of Visitors

Robert A. Gleason, Jr., personally and in his official capacity as a member of the United States Air Force Academy Board of Visitors

Mark Green, M.D., personally and in his official capacity as a member of the United States Military Academy Board of Visitors and a Member of the United States House Armed Services Committee and the United States Congress

Ralph Norman, personally and in his official capacity as a Member of the United States Congress

Sean Spicer, personally and in his official capacity as a member of the United States Naval Academy Board of Visitors

Appellees:     Joseph R. Biden, Jr. in his official capacity as President of the United States

Catherine M. Russell, in her official capacity as Director of the White House Presidential Personnel Office

United States Department of Defense

i

General Lloyd J. Austin, III, USA (Ret.), in his official capacity as United States Secretary of Defense

United States Department of the Air Force

Frank Kendall, in his official capacity as the Secretary of the Air Force

United States Air Force Academy

Lieutenant General Richard M. Clark, USAF, in his official capacity as Superintendent, United States Air Force Academy

United States Department of the Army

Christine Wormuth, in her official capacity as the Secretary of the Army (acting)

United States Military Academy

Lieutenant General Darryl A. Williams, USA, in his official capacity as Superintendent, United States Military Academy

United States Department of the Navy

Carlos del Toro, in his official capacity as the Secretary of the Navy

United States Naval Academy

Vice Admiral Sean S. Buck, USN, in his official capacity as Superintendent, United States Naval Academy

Raphael J. Thalakottur, in his official capacity as a Designated Federal Officer of the United States Naval Academy Board of Visitors

> Anthony Ryan McDonald, in his official capacity
> as Designated Federal Officer of the United States
> Air Force Academy Board of Visitors
>
> Deandra K. Ghostlaw, in her official capacity as
> Designated Federal Officer of the United States
> Military Academy

No intervenors or *amici* have appeared.

The ruling under review is the final, appealable order[1] of the Honorable Timothy J. Kelly of the United States District Court for the District of Columbia granting Defendants' motion to dismiss Plaintiff's Fourth Amended Complaint on March 21, 2003. The accompanying memorandum order was reported at *Stirrup v. Biden*, Civ. A. No. 21-1893, 2023 U.S. Dist. LEXIS 47761 (D.D.C. Mar. 21, 2023).[2]

The case has not previously been before this or any other court, and there are no related cases.

---

[1] App025.
[2] App001–024.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.......................................................... vi

JURISDICTIONAL STATEMENT ...........................................................1

PERTINENT STATUTES AND REGULATIONS...................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............................2

STATEMENT OF THE CASE................................................................3

SUMMARY OF ARGUMENT................................................................4

STANDARD OF REVIEW ................................................................7

STATEMENT OF FACTS ................................................................8

    The Academies' Boards of Visitors and Their Statutory Frameworks...........8

    Appointment of Plaintiffs to the Academies' BOVs ....................................11

    The Secretary of Defense's Unlawful Suspension of the Boards..................12

    The President's Unlawful Termination of Plaintiffs Stirrup, Lengenfelder, and Gleason ................................................13

    The Secretary of Defense's Issuance of the Reinstatement Memoranda and the Unauthorized Creation of BOV Subcommittees ....................................15

ARGUMENT ................................................................16

I.     INTRODUCTION ........................................................16

II.    THE PLAINTIFFS HAVE STANDING TO SEEK FULL AND COMPLETE RELIEF FOR THE DELIBERATE VIOLATIONS OF LAW COMMITTED BY PRESIDENT BIDEN AND OTHER MEMBERS OF HIS ADMINISTRATION. ................................................21

    A.     Subcommittees. ..................................................26

B.      Declaratory and Injunctive Relief Against the Removal From Office. ............................................................................................27

III.    THE DISTRICT COURT ERRED ON THE MERITS WHEN IT CONCLUDED THAT THE FEDERAL ADVISORY COMMITTEE ACT DOES NOT PROTECT THE TRUMP PRESIDENTIAL APPOINTMENTS TO BOVS FROM DISMISSAL. ..................................................................29

A.      The BOVs Are Not Constitutional If the President Retains the Power To Fire Prior Presidential Appointees at Will. ...................................31

B.      The President Cannot Remove Board Members With Term Appointments, Even If the Appointments Clause Objection Does Not Prevail, Given Their Protected Constitutional Status. ........................33

IV.     PLAINTIFFS HAVE STATED A VALID CAUSE OF ACTION FOR BREACH OF CONTRACT...........................................................................46

V.      THE PLAINTIFFS HAVE PROPERLY ALLEGED THAT THE ACTIONS OF THE PRESIDENT HAVE ABRIDGED THEIR FREEDOM OF SPEECH. ..................................................................................................49

VI.     IN LIGHT OF THE MULTIPLE AND REPEATED VIOLATIONS COMMITTED BY THE BIDEN ADMINISTRATION THE NECESSARY AND ONLY WORKABLE REMEDY IN THIS CASE IS A PERMANENT INJUNCTION THAT BARS ALL FUTURE PRESIDENTS FROM FIRING SITTING MEMBERS OF THE BOVS DURING THE TERM OF APPOINTMENT. ........................................................................................52

CONCLUSION ......................................................................................................54

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS ................................A

## TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................................7

*Banneker Ventures, LLC v. Graham*, 798 F.3d 1119 (D.C. Cir. 2015).......................8

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)........................................................7

*Buckley v. Valeo*, 424 U.S. 1 (1976).............................................. 2, 5, 19, 31, 32, 43

*Carlucci v. Doe,* 488 U.S. 93 (1988).................................................... 34, 45, 46, 48

*Connick v. Myers*, 461 U.S. 138 (1983)....................................................................51

*Franklin v. Massachusetts*, 505 U.S. 788 (1992)......................................................22

*Humphrey's Executor v. United States*, 295 U.S. 602 (1935) ......................... 5, 6, 37

*In re Hennen*, 38 U.S. 230 (1839).................................................................... 34, 35

*Lewis v. Pension Benefit Guaranty Corp.*, 912 F.3d 605 (D.C. Cir. 2018)................7

*Lorillard v. Pons,* 434 U.S. 575 (1978)............................................................ 41, 43

*Loving v. IRS*, 742 F.3d 1013 (D.C. Cir. 2014) ........................................................20

*Marbury v. Madison*, 5 U.S. 137 (1803) .................................................... 35, 36, 37

*Myers v. United States,* 272 U.S. 52 (1926)................................................... 35, 37

*Newdow v. Roberts*, 603 F.3d 1002(D.C. 2010)......................................................22

*NLRB v. Noel Canning*, 573 U.S. 513 (2014) ..........................................................35

*Parsons v. United States*, 167 U.S. 324 (1897).............. 6, 34, 35, 37, 39, 41, 43, 46

*Severino v. Biden*, 71 F.4th 1038 (D.C. Cir. 2023) ............. 23, 24, 25, 41, 42, 43, 44

*Silver v. Internal Revenue Service,* 569 F.3d 5 (D.D.C. 2021) ...............................28

*Spicer v. Biden*, 575 F. Supp.3d 93 (D.D.C. 2021) ............................. i, 12, 21, 23, 25

*Spokeo v. Robins*, 578 U.S. 330 (2016)....................................................21

*Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011) ............................................8

*Stirrup v. Biden*, Civ. A. No. 21-1893, 2023 U.S. Dist. LEXIS 47761 (D.D.C. Mar. 21, 2023) ...................................................... 16, 28

*Swan v. Clinton,* 100 F.3d 973 (D.C. Cir. 1996) ........................... 22, 23, 24, 25, 26

*United States v. Alabama G. S. R. Co.*, 142 U.S.615 (1892) ...................................46

*United States v. Wilson*, 290 F. 3d 347 (D.C Cir. 2002) ..........................................41

*Uzuegbunam v. Preczewski*, 141 S.Ct. 792 (2021) ...................................................21

*Vote Vets Action Fund v. U.S. Dep't of Veterans Affairs*, 992 F.3d 1097 (D.C. Cir. 2021)...................................................................................................7

*Watson v. United States*, 552 U.S. 74 (2007) ...........................................................40

*Wiener v. United States*, 357 U.S. 349 (1958) ................. 5, 6, 37, 38, 39, 41, 43, 46

*Winter v. United States*, 550 U.S. 7 (2008) ............................................................23

*Youngstown Steel v. Sawyer*, 343 U.S. 579 (1952) ...................................................33

**Statutes**

10 U.S.C. § 7455 ..................................................................... 2, 5, 8, 9, 16

10 U.S.C. § 8468 ..................................................................... 2, 5, 8, 9, 16

10 U.S.C. § 9455 ................................................................. 2, 5, 8, 9, 16, 39

28 U.S.C. § 1291 ...........................................................................................1

28 U.S.C. § 1331 ...........................................................................................1

Federal Advisory Committee Act, 5 U.S.C. §§ 1001–14 (2022)..2, 9, 10, 11, 17, 39, 43, 44, 46, 47, 54

Pub. L. No. 117-286, § 3, 136 Stat. 4196, 4197–4206 (2022)...................................2

War Claims Act of 1948, 50 U.S.C. § 4104–47 (2018) ...........................................39

**Other Authorities**

Adrian Vermeule, *Conventions of Agency Independence*, 113 Colum. L. Rev. 1163 (2013) .................................................................................... 48, 49

Chris Cameron, *White House Forces Out Trump Appointees From Boards of Military Academies*, New York Times (Sept. 8, 2021) ........................................51

*Expire*, *Merriam Webster Dictionary* .......................................................................40

*Fired*, *Corporate Finance Institute* .........................................................................40

Handelsman Shugerman, *Presidential Removal: The Marbury Problem and the Madison Solutions,* 89 Fordham. L. Rev. 2085 (2021)........................................36

Jane Manners & Lev Menand, *The Three Permissions: Presidential Removal and the Statutory Limits of Agency Independence*, 121 Colum. L. Rev. 1 (2021)......36

John Manning, *Separation of Powers as Ordinary Interpretation*, 124 Harv. L. Rev. 1939 (2011) .............................................................................................36

Kristen Holmes et al, *Biden administration works to clean house of Trump appointees*, CNN (Feb. 6, 2021) .........................................................................15

Memorandum for Senior Pentagon Leadership, Commanders of the Combatant Commands, Defense Agency and DoD Field Activity Directors from the Secretary of Defense (Jan. 30, 2021) ..................................................... 13, 15, 21

Peggy McGlone, *Biden removes Trump appointees from boards that shape the District*, Washington Post (Feb. 10, 2021)............................................................14

Restatement (Second) of Contracts § 367 cmt. A (Am. L. Inst. 1981)....................49

The White House, *Press Briefing by Press Secretary Jen Psaki, Secretary of Agriculture Tom Vilsack, and National Economic Council Director Brian Deese, September 8, 2021* (Sep. 8, 2021, 3:21 PM) (statement of Press Secretary Jen Psaki) ............................................................................................50

U.S. Const. art. II, § 1, cl. 1 ...................................................................42

U.S. Const. art. II, § 2, cl. 2 .....................................................................5

U.S. Const. art. III .................................................... 18, 21, 24, 36, 44

Uniform Commercial Code § 2-208 (Unif. L. Comm'n 1977) ...............48

USAFA Board of Visitors Bylaws ..........................................................11

USAFA Board of Visitors Charter .......................................................8, 11

USMA Board of Visitors Charter ........................................................8, 11

USNA Board of Visitors Charter .........................................................8, 11

Wallace Ludel, *President Joe Biden removes Trump appointees from US Commission of Fine Arts*, The Art Newspaper (May 25, 2021) ..........................15

## Rules

D.C. Cir. R. 28(a) ......................................................................................1

Fed. R. App. P. 28(f) .................................................................................1

Fed. R. App. P. 32 ....................................................................................A

Fed. R. App. P. 4 .......................................................................................1

Fed. R. Civ. P. 12 ......................................................................................7

## Regulations

41 C.F.R. § 102-3.105 ....................................................... 9, 10, 18

41 C.F.R. § 102-3.120 ............................................................................11

41 C.F.R. § 102-3.30 ..................................................................................10

41 C.F.R. § 102-3.50 ....................................................................................8

41 C.F.R. Part 102-3 (2023)....................................................................2, 9

Department of Defense Instruction 5104.04, *Department of Defense Federal
Advisory Committee Management Program* ......................................2, 10, 11, 16

**GLOSSARY**

| | |
|---|---|
| ACUS | Administrative Conference of the United States |
| BOV | Board(s) of Visitors |
| DFO | Designated Federal Officer |
| DoD | Department of Defense |
| DoDI | Department of Defense Instruction |
| FACA | Federal Advisory Committee Act |
| NCUA | National Credit Union Association |
| OSD | Office of the Secretary of Defense |
| UCC | Uniform Commercial Code |
| USAFA | United States Air Force Academy |
| USMA | United States Military Academy |
| USNA | United States Naval Academy |
| ZBR | Zero-Based Review |

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction under 28 U.S.C. § 1331. The case concerns the removal power of the President of the United States under Art. II of the U.S. Constitution and the federal statutes establishing the Boards of Visitors ("Boards" or "BOVs") of the United States Air Force Academy ("USAFA"), Military Academy ("USMA"), and Naval Academy ("USNA") (collectively the "Academies"). It further concerns whether the Secretary of Defense ("Secretary") had authority under the statutes to suspend the Boards for more than seven months and to authorize the Air Force, Army, and Navy Secretaries to establish BOV subcommittees.

This Court has appellate jurisdiction under 28 U.S.C. § 1291 and Fed. R. App. P. 4(a)(1)(B), because it is from a final judgment of the District Court and disposing of all parties' claims. The District Court entered judgment on March 21, 2023; Plaintiffs filed their Notice of Appeal on April 25, 2023. One or more Defendant is a U.S. agency or officer sued in an official capacity, so the appeal is timely under Fed. R. App. P. 4(a)(1)(B)(ii) and (iii).

## PERTINENT STATUTES AND REGULATIONS

Pursuant to Fed. R. App. P. 28(f) and D.C. Cir. R. 28(a), the statutes and regulations pertinent to the Court's determination of the issues presented are set forth in the Addendum. These include 5 U.S.C. § 1001–14 (2022) (Federal

1

Advisory Committee Act "FACA"),[3] 10 U.S.C. §§ 7455, 8468, and 9455 (2018) (establishing the Academies' BOVs), 41 C.F.R.§§ Part 102-3 (2023) (implementing regulations), and DoD Instruction ("DoDI") 5104.04, *Department of Defense Federal Advisory Committee Management Program* (August 6, 2007).

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.    Whether the District Court erred in granting Defendants' Motion to Dismiss by holding that Plaintiffs lacked standing to

  a.    challenge the Secretary's unauthorized suspension of the BOVs in February 2021 and

  b.    challenge the Secretary's unauthorized directive in September 2021 to the Secretaries of the Army, Navy, and Air Force allowing each to create subcommittees of the BOVs comprising individuals chosen by the Secretary or his Deputy, including individuals not on their respective BOVs.

2.    Whether the District Court erred in determining the President could remove members from these independent boards given the limitations on the appointments power under *Buckley v. Valeo*, 424 U.S. 1 (1976).

3.    Whether the District Court erred in granting Defendants' Motion to Dismiss by holding that President Biden had the plenary authority to fire members

---

[3] The FACA was recently moved from the    Appendix to Title 5, U.S. Code. *See* Pub. L. No. 117-286, § 3, 136 Stat. 4196, 4197–4206 (2022).

of the BOVs appointed to those positions by President Trump as if they were individuals entirely within the executive branch, and by further holding that no constitutional issue was implicated by those firings.

4.    Whether the District Court erred in granting Defendants' Motion to Dismiss by holding that Plaintiffs' Fourth Amended Complaint failed to state a claim for breach of contract.

5.    Whether the District Court erred in granting Defendants' Motion to Dismiss by holding that Plaintiffs' Fourth Amended Complaint failed to state a claim for viewpoint discrimination in violation of the First Amendment to the U.S. Constitution.

### STATEMENT OF THE CASE

Plaintiffs are three former members of the USAFA BOV, one former member of the USNA BOV, and two Members of Congress who challenge the authority of the President to remove the four former BOV members from their respective Boards in September 2021 and the authority of the Secretary to 1) suspend the operations of the Boards for more than seven months beginning in February 2021, and 2) authorize, in September 2021, the Secretaries of the Air Force, Army, and Navy to create subcommittees of the BOVs and to staff them with non-BOV members approved either by the Secretary or his Deputy.

3

Plaintiffs filed suit in the District Court below on July 15, 2021. They filed an Amended Complaint on August 16, 2021, a Second Amended Complaint on September 9, 2021, and a Third Amended Complaint on November 10, 2021. On January 31, 2022, Defendants filed a Motion to Dismiss. On February 28, 2022, Plaintiffs filed both a Response to Defendants' Motion to Dismiss and a Motion for Leave to File a Fourth Amended complaint intended to address deficiencies alleged in the Defendants' Motion.

On April 7, 2022, the District Court allowed Plaintiffs to file their Fourth Amended Complaint, denied a Government Motion to Dismiss as moot, and set a new briefing schedule. Defendants filed a Motion to Dismiss the Fourth Amended Complaint on May 9, 2022, which by June 20, 2022, was fully briefed.

The District Court granted Defendants' Motion on March 21, 2023.

## SUMMARY OF ARGUMENT

On September 8, 2021, President Joseph Biden Jr., unilaterally purported to fire each Presidential member of the BOVs of this Country's three Academies who had been appointed by his predecessor Donald Trump to rotating three-year terms. For decades, these Boards had been known for their excellence, bipartisanship, independence, and diversity of views. Biden is the first and indeed only President ever to peremptorily remove members from the Boards—not just the Service Academy Boards, but others dealing with a range of issues, e.g., art and

4

architecture, science, the environment, and more. His stated reason—to staff the BOVs only with people who share his values—necessarily compromises the independence of these advisory boards, removing the checks and balances that protected these Boards from political intrigue.

The President's undefended assumption was that these Board members were "officers" within the Executive Branch: But that assumption is flatly false. All officers in the Executive Branch must be appointed exclusively under the Appointments Clause, U.S. Const. art. II, § 2, cl. 2, by parties located within the Executive Branch. *See Buckley v. Valeo*, 424 U.S. 1, 124–128 (1976). But the majority of BOV members are either, by law, designated members of Congress or individuals *they* designate, 10 U.S.C. §§ 7455(a)(1)–(4), 8468(a)(1)–(4), and 9455(a)(2)–(5), and the President "designates" the others, *id*. §§ 7455(a)(5), 8468(a)(5), 9455(a)(1). These Boards would be plainly unconstitutional if they exercised executive power; since they do not, their members are immune from Presidential removal.

Indeed, these Presidential actions are doubly unconstitutional, for not only are these Board members under *Buckley*, but they are also protected by longstanding precedent developed in connection with officials of tribunals, *Wiener v. United States*, 357 U.S. 349 (1958), and commissions, *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), both of which treat appointments for a term of

5

years as limiting the right of the President to dismiss at will certain high level officials. *Weiner* held that when Congress specified that members of a War Claims Commission were to serve for three years – where the Commission's work was to be completed by the end of that term – dismissal of a Commissioner was barred, in absent any specific provision allowing for his at-will removal, by analogy to *Humphrey's* because of a sharp distinction "between those who are part of the Executive establishment and those whose tasks require absolute freedom from Executive interference." *Wiener*, 357 U.S. at 353. Advisory board members are not executive branch employees, like the district attorneys in *Parsons v. United States*, 167 U.S. 324 (1897), on which the Government wrongly hangs its entire case. Hence these Board members cannot be fired by the President simply because Congress said nothing about it. *Id*.

Not only does the President lack the power to remove Board members, but he lacks the power to suspend their operations, either directly or by delegating that power to Executive Branch officers, including the Secretary and his subordinates. The Secretary has no power to manufacture subcommittees, and then to staff them with individuals who are not members of the BOVs. Even if the Secretary wants to conduct a "zero-based" review of the Boards' operations, his purported shut down exceeds his statutory authority. There are no constitutional reasons why Plaintiffs lack the standing to protest their own dismissal and the illegal actions of the

6

Secretary. Accordingly, Plaintiffs should be allowed to pursue their well-pleaded causes of action in each count of their Fourth Amended Complaint.

## STANDARD OF REVIEW

This Court reviews *de novo* the District Court's grant of a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *Lewis v. Pension Benefit Guaranty Corp.*, 912 F.3d 605, 609 (D.C. Cir. 2018). Where, as here, the District Court's dismissal was of Plaintiff's Fourth Amended Complaint, for purposes of this appeal this Court must assume the truth of its factual allegations. *Vote Vets Action Fund v. U.S. Dep't of Veterans Affairs*, 992 F.3d 1097, 1104 (D.C. Cir. 2021). Plaintiffs need not make "detailed factual allegations," but, "[t]o survive a motion to dismiss, [their] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). "A claim has facial plausibility when [a] Plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The standard requires "more than a sheer possibility that a defendant has acted unlawfully" but "is not akin to a 'probability requirement.'" *Id.* (quoting *Twombly*, 550 U.S. at 556). "A complaint survives a motion to dismiss even '[i]f there are two alternative explanations, one advanced by [the] defendant and the other advanced by [the] plaintiff, both of which are plausible.'" *Banneker*

*Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)).

## STATEMENT OF FACTS

### *The Academies' Boards of Visitors and Their Statutory Frameworks*

The BOVs are mandated by federal statute to investigate, oversee, and make recommendations about the Academies to the Defendants, to the United States House and Senate Armed Services Committees (respectively "HASC" and "SASC"), and/or to the President of the United States. *See* 10 U.S.C. § 9455 (USAFA BOV); § 7455 (USMA BOV); § 8468 (USNA BOV). The oversight and investigative authority of the BOVs thus flows from the powers of Congress as set forth in Art. I of the Constitution. The BOVs are "non-discretionary," because they are creatures of statute, 41 C.F.R. § 102-3.50(a), and, rather than directing the President or the Department of Defense ("DoD") to establish them, Congress did so itself. *Id.*

The Boards wield neither executive power nor "quasi-legislative" or "quasi-judicial" power. Under their respective Charters, these BOVs "shall provide independent advice and recommendations." Charter, USAFA BOV, Sect. 3, App044; Charter, USMA BOV, Sect. 3, App049; Charter, USNA BOV, Sect. 3, App052; *see id*., Sects. 2 (describing each Board as a "non-discretionary advisory committee"). Each Board "member, based upon his or her individual experiences,

8

exercises his or her own best judgment concerning matters before the Committee, does not represent any particular point of view, and discusses and deliberates in a manner that is free from conflicts of interest." *Id.*, Sect. 12. To preserve its independence from the President, Members of Congress, not members of the Executive Branch, serve as authorized members of the Academies' BOVs.

Each of the three BOVs has 15 members. Six of those members are appointed by the President. Each Presidential appointee has a three-year term, but any such appointee may remain as a Board member after the expiration of his or her term until the President designates a replacement. 10 U.S.C. § 9455(b); § 7455(b); § 8468(b). The terms are staggered so that each year, the President may appoint two persons to succeed the two members whose terms expire. *Id.* The other members consist of the SASC Chairman or his/her designee, the HASC Chairman or his/her designee, four other Members of the House designated by the Speaker of the House, and three other Members of the Senate designated by the Vice President or the President Pro Tempore of the Senate. 10 U.S.C. § 9455(a)(1-5); § 7455(a)(1-5); § 8468(a)(1-5).

The administration and management of the BOVs is governed by the FACA and its implementing regulations, 41 C.F.R. Part 102-3 (2023). Pursuant to 41 C.F.R. § 102-3.105(b), the DoD has issued regulations for the administration and

management of the DoD federal advisory committees. *See* DoD Instruction ("DoDI") 5104.04 (August 6, 2007).

FACA's implementing regulations require that the BOVs, like all advisory committees within FACA's purview, have "[b]alanced membership"; specifically, each of the BOV's "must be fairly balanced in its membership in terms of the points of view represented and the functions to be performed." 41 C.F.R. § 102-3.30(c). The Secretary, as agency head of the DoD, must "[d]evelop procedures to assure that the advice or recommendations of advisory committees will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment." *Id.*, § 102-3.105(g). Moreover, DoDI 5105.04, ¶ 4.6, sets forth as DoD policy "Committee membership, as a whole, shall be balanced in terms of points of view and the functions to be performed." *Id.*

None of the governing statutes provides for the creation of BOV subcommittees; nor do they authorize the Secretary or his Deputy to staff such subcommittees with appointees selected at their sole discretion, let alone to staff them with individuals who are not members of the BOVs. No such subcommittee has ever been authorized or staffed at the directive of any previous Secretary, because DoD had previously determined that any such subcommittees had no lawful authority, a decision Defendant Austin acknowledged in three memoranda

dated September 17, 2021.[4] Indeed, DoDI 5105.04, ¶ 5.6.2, expressly states that the Designated Federal Officer ("DFO") "*shall . . .*[e]nsure that no DoD-Supported Committee establishes Subcommittees unless specifically authorized by statute, executive order, or the Committee's Charter." *Id.* (emphasis added.)

The members of each of the three Boards select the Chairman. Charters, Sects. 12. The Chairman has responsibilities over the Board's operations and meetings, including the certification of all meeting minutes. 5 U.S.C. § 1009 (c) (2018). Each Board has a DFO, who is designated by the DoD in accordance with DoDI 5105.04, ¶ 5.3.6. *See also* Charters, Sects. 8. The responsibilities and functions of the DFO's are governed by 41 C.F.R. § 102-3.120 and DoDI 5105.04, ¶ 5.6. Nothing in either the C.F.R. or the DoDI (or in the case of the USAFA BOV, in its Bylaws, App055,061) authorizes a DFO, let alone the Secretary, to suspend the operation of a BOV.

***Appointment of Plaintiffs to the Academies' BOVs***

President Trump appointed Plaintiff Heidi Stirrup to the USAFA BOV on December 17, 2020. Her term was set to expire on December 30, 2021.

President Trump appointed Plaintiff Douglas Lengenfelder to the USAFA BOV on June 28, 2020. His term expired on December 31, 2021.

---

[4] App026–028.

President Trump appointed Plaintiff Robert Gleason, Jr., to the USAFA BOV on July 27, 2018, and reappointed him on December 17, 2020. His term expired on December 31, 2023.

The Speaker of the House of Representatives appointed Plaintiff Mark Green, M.D., to the USMA BOV on March 15, 2021. His term expired on December 30, 2022.

President Trump appointed Plaintiff Sean Spicer to the USNA BOV in 2019. His term expired on December 30, 2021.

***The Secretary of Defense's Unlawful Suspension of the Boards***

On February 4, 2021, Plaintiffs Stirrup, Lengenfelder, and Gleason, as well as other Presidential (but not congressional) appointees to the AFA BOV, received an email from Anthony McDonald, a GS-15, the USAFA BOV's DFO.[5] The email states, in pertinent part, as follows:

> I am reaching out today to inform you that the Secretary of Defense has suspended the operations of all DoD Advisory Committees pending completion of a Zero-Based Review with our review being due to OSD no later than 30 April 2021. You will likely hear about advisory committees being disestablished and board members released from service but given our committee is non-discretionary (required by law) it will remain in place and your board membership will not be impacted.

_____

[5] App029.

12

What does the suspension mean for our board? It means the board will not hold any meetings (formal, preparatory, etc.) or otherwise undertake official board business that would drive expenditure of public funds until the Secretary of Defense has reviewed our business case analysis and lifted suspension of our advisory committee. As such, our previously scheduled 8 April 2021 meeting will be rescheduled to a later date to be determined.

In the meantime, Headquarters Air Force and USAFA staff still have administrative requirements that must be completed in accordance with the Federal Advisory Committee Act and DoD policy such as record-keeping, publishing of minutes, reports, etc. as well as administrative functions related to fully onboarding the new members (background/clearance, ethics, disclosures, etc.). I'd ask for your full and timely cooperation in those matters. Finally, you will continue to receive periodic updates on matters germane to the board.

Accompanying this email were two Memoranda, dated January 30, 2021 and February 2, 2021, respectively, from the Office of the Secretary suspending the USAFA, USMA, and USNA BOVs.[6] No statutory authorization was cited.

### *The President's Unlawful Termination of Plaintiffs Stirrup, Lengenfelder, and Gleason*

On September 8, 2021, Plaintiffs Stirrup, Lengenfelder, and Gleason received materially identical e-mails from Katherine Petrelius, Special Assistant to the President, Office of Presidential Personnel, which stated:

I am writing to request your resignation from the Board of Visitors to the United States Air Force Academy. If we do not

---

[6] App033–042, 031–032.

13

receive your resignation by the end of the day today, you will be terminated. Attached is a formal letter.[7]

The e-mails each included an attached letter from Defendant Catherine M. Russell, director of the White House Presidential Personnel Office. The letters stated,

> On behalf of President Biden, I am writing to request your resignation as a Member of the Board of Visitors to the U.S. Air Force Academy. Please submit your resignation to me by the close of business today. Should we not receive your resignation, your position with the Board will be terminated effective 6:00 p.m. tonight. Thank you.[8]

These letters were part of a general pattern that extended beyond the Academies. President Biden also summarily removed Trump appointees to the National Capital Planning Commission that oversees real estate development in and around Washington D.C., Peggy McGlone, *Biden removes Trump appointees from boards that shape the District*, Washington Post (Feb. 10, 2021, 11:52 AM), https://www.washingtonpost.com/entertainment/biden-removes-trump-appointees/ 2021/02/10/6b449a90-6ba9-11eb-9f80-3d7646ce1bc0_story.html. Similarly, he used the same ultimatum letter to remove the members of the United States Commission of Fine Arts, including its chairman Justin Shubow. Wallace Ludel, *President Joe Biden removes Trump appointees from US Commission of Fine Arts*,

---

[7] App062.
[8] App043.

14

The Art Newspaper (May 25, 2021), https://www.theartnewspaper.com/2021/05/25/president-joe-biden-removes-trump-appointees-from-us-commission-of-fine-arts. Afterwards Shubow noted that "[i]n the Commission's 110-year history, no commissioner has ever been removed by a President, let alone the commission's chairman." *Id.* These actions were part of a general effort of the Biden administration to clean house of Trump appointees. *See* Kristen Holmes et al, *Biden administration works to clean house of Trump appointees*, CNN (Feb. 6, 2021, 8:33 PM), https://www.cnn.com/2021/02/06/politics/biden-removing-trump-board-appointments/index.html.

In this case, Plaintiffs Stirrup, Lengenfelder, and Gleason responded in writing to Defendant Russell saying that they would not resign as a member of the USAFA BOV. They also noted that the relevant statutes gave the President no authority requiring them to do so or even allowing them to be terminated.

### *The Secretary of Defense's Issuance of the Reinstatement Memoranda and the Unauthorized Creation of BOV Subcommittees*

On or about September 17, 2021, 19 days after the instant lawsuit was served on Defendants, the DoD and Secretary Austin sent memoranda to the Secretaries of the Air Force, Army, and Navy purporting to reinstate the

Academies' BOVs.[9] Despite the absence of any statutory or regulatory authority, the memoranda further purport to authorize the service Secretaries to create BOV "subcommittees" staffed by appointees, including *non-BOV-members*, selected at the sole discretion of the Secretary or his Deputy. This authorization was flatly illegal. *See* DoDI 5105.04, ¶ 5.6.2.

**ARGUMENT**

## I.    INTRODUCTION

These Plaintiffs appeal from a judgment below that the District Court entered against them on March 31, 2023. *See Stirrup v. Biden*, Civ. A. No. 21-1893, 2023 U.S. Dist. LEXIS 47761 (D.D.C. Mar. 21, 2023). That decision dismissed their claims partly on standing grounds and partly on the merits. The Plaintiffs take strong exception those portions of the opinion that reject their claims, because they all rest on a sanitized version of the facts that conceals the deep political motivations of the Biden Administration that cast doubts on all the reasons that it has advanced to defend its removals of Plaintiff members from their respective BOVs.

Each of these three boards has explicit Congressional authorization: See 10 U.S.C. § 9455 (USAFA BOV); § 7455 (USMA BOV); § 8468 (USNA BOV). As

---

[9] App026–028.

such, it is beyond the power of any President, or those who serve under him, to deviate from its requirements. Pursuant to these statutes, four of Plaintiffs were appointed to three-year terms on the service academy advisory boards by former President Donald Trump. An additional Plaintiff was an appointee of the Speaker of the House per the statutory design. Under the statutory scheme each of the six presidential members is supposed to retain their positions for the full length of their three-year term in order to diffuse power over time through a principle of rotation in office, which allowed them to give independent advice to the President and other government officials without fear of retaliation. It is indisputable that these three Trump appointees to the BOVs were fired solely because they were Trump nominees who necessarily did not share the "values" of the Biden administration. The two Biden appointees kept their offices.

Nonetheless the District Court simply stated that "[f]our Plaintiffs were presidential appointees to those committees that President Biden fired after taking office," without once mentioning that they were Trump appointees sacked by an antagonistic Biden administration. The omission could not stem from simple inadvertence. It was a determined effort to overlook the fundamental political biases of the Biden administration. Yet, as the District Court also acknowledged, the FACA requires that the Boards' membership be "fairly balanced in terms of the points of view represented and the functions to be performed by the advisory

committee," *id.* § 1004(b)(2), and that their "advice and recommendations" will "be the result of [their] independent judgment," *id.* § 1004(b)(3). *See also* 41 C.F.R. § 102-3.105(g) . But at no point does the District Court once explain how that independence can be honored when Katherine Petrelius, Special Assistant to the President, wrote: "If we do not receive your resignation by the end of the day today, you will be terminated," as indeed they were. Nonetheless, the District Court concluded that President Biden had the complete statutory authority to fire these appointees, even though the statute under which they were appointed said exactly the opposite. Their three-year terms would be meaningless if the President had some undefined, but inherent, statutory authority to override the specific provision on the appointive process. Indeed, under the District Court's logic what Biden had done to the Trump appointees could be done to all the Biden appointees by the next Republican president seeking political revenge for the Biden dismissals. This eminently probable—not speculative—scenario will, if upheld, lead to the total evisceration of the statutory scheme for all time.

As the Plaintiffs will now show, the opinion of the District Court was only correct insofar as it accepted the obvious point that standing under Art. III covers people who have been forcibly removed from office to challenge their dismissal. But thereafter the question arises as to what form of relief should be provided. The Plaintiffs sought a declaratory judgment that their suspensions were illegal and

requested an injunction preventing further suspending or otherwise interfering with the Boards by the Biden administration. They also sought to enjoin the Secretary of Defense from appointing outsiders as subcommittees to the Board because, by definition, subcommittees must be composed of committee members, lest the power of the Board members be improperly diluted, by introducing multiple tiers of membership on the Advisory Boards. The remedial options are difficult, but they cannot be wished away as "speculative," App010, given that the disruptive actions of the President have robbed them of their time of service—a wrong that is compounded by illegally appointing other individuals to their terms, robbing these Biden-created ersatz boards of any legitimacy. It is thus imperative to address how best to fashion relief for Board members who were illegally sacked from the office only to find their terms expired.

The District Court also made a complete hash of the substantive claims by holding that it could ignore all constitutional challenges to these dismissals by holding that there was a "nonconstitutional ground for deciding the case," App016, without ever asking whether the President had the power to dismiss members of the advisory committees, none of whom are officers of the United States. In fact, the first question is whether the statute is in fact constitutional if the asserted power of dismissal lies with the President, to which the only correct answer under *Buckley v. Valeo*, 424 U.S. 1 (1976), is no, because of the firm rule that Congress

has no power under the Appointments Clause, U. S. Const. Art. II, Section 2, cl. 2, to appoint any *officers*, given that all such powers are in the President, the heads of departments and the courts.

Hence this dilemma. These advisory committees are constitutional only if these advisory board members are not "officers" which is indeed the case because, as their name implies, they have no power to implement policy. So if the President Biden can dismiss President Trump' appointees, the BOVS are not constitutionally established. And if the Board is constitutional—as over 50 years of uniform practice confirm—then Biden cannot dismiss the Trump appointees at all. Yet this issue was wholly ignored by the District Court, which then adopted a mode of statutory that *implied* a power of removal that went against every known tool of statutory interpretation—text, structure, history, function purpose, and past practice—all of which kept these advisory board members outside the purview of Presidential power. *Loving v. IRS*, 742 F.3d 1013, 1021–22 (D.C. Cir. 2014). But rather than facing this challenge, the District Court blithely dismissed "Plaintiff's mélange of statutory and constitutional arguments [as lacking analytical force]." App016. In a case that goes to the roots of our constitutional structure, the opinion below must be reversed.

20

## II. THE PLAINTIFFS HAVE STANDING TO SEEK FULL AND COMPLETE RELIEF FOR THE DELIBERATE VIOLATIONS OF LAW COMMITTED BY PRESIDENT BIDEN AND OTHER MEMBERS OF HIS ADMINISTRATION.

Many decisions of the Supreme Court state that the plaintiff must establish standing to bring its lawsuit in federal court under Art. III of the Constitution. At a minimum proof of standing requires three elements: "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. See *Spokeo v. Robins*, 578 U.S. 330, 338 (2016); *Uzuegbunam v. Preczewski*, 141 S.Ct. 792, 797 (2021). The first element of injury in fact requires in turn that any plaintiff must show a harm that is distinct and concrete to that plaintiff and not just "a generally available grievance"

This first element of standing is established without doubt, given that five (Stirrup, Lengenfelder, Gleason, Green, Spicer) of these Plaintiffs were denied the opportunity to serve on these committees as of February 4, 2021, when their operation was suspended until April 30, 2021, for the ostensible purpose of conducting a zero-based review ("ZBR"). App033–042.[10] Thereafter, four of them

---

[10] Memorandum for Senior Pentagon Leadership, Commanders of the Combatant Commands, Defense Agency and DoD Field Activity Directors from the Sec'y of Defense (Jan. 30, 2021), https://media.defense.gov/2021/ Feb/02/2002574747/-1/-1/0/DOD-ADVISORY-COMMITTEES-ZERO-BASED-REVIEW.

(Stirrup, Lengenfelder, Gleason, Spicer) were removed from their respective Boards by the President of the United States on September 8, 2021, and the fifth Plaintiff (Norman, a member of Congress), like the other four Plaintiffs, suffered the disruption of the activities of these committees, which surely counts as a discrete harm to these persons. Indeed, similar claims for standing were accepted in *every* case in which this issue has been litigated.

The first complication in this case thus concerns the second element of standing, which requires that the injury be fairly traceable to the activity of the defendant. The obvious defendant is the President of the United States who directed the dismissals of these parties. Nonetheless, the President while in office is immune from suit for activities that are done within the scope of his office, which would include these dismissals. Hence this Court cannot enjoin the President or subject him to declaratory relief. *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. 2010). *See also Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992).

But there are countervailing considerations that are more powerful. Thus, see *Swan v. Clinton,* 100 F.3d 973, 979 (D.C. Cir. 1996), where the Court of Appeals wrote:

> On the other side of the scale [from claims of presidential immunity], of course, is the bedrock principle that our system of government is founded on the rule of law, and it is sometimes a necessary function of the judiciary to determine if

> the executive branch is abiding by the terms of legislative
> enactments.

*Id.* at 978, thus stands for the proposition that the immunity of the President from suit does not deprive the Plaintiffs standing to bring an action against other administration officials—of whom several are named in the Fourth Amended Complaint. See Pl. Trial Brief at 13. *Swan* has been followed both in *Spicer v. Biden*, 575 F. Supp.3d 93 (D.D.C. 2021) and in *Severino v. Biden*, 71 F.4th 1038, 1042–43 (D.C. Cir. 2023). In *Spicer*, President Biden removed Spicer from a BOV, for which he sought emergency relief by way of preliminary injunction so that he could be returned to his seat to attend meetings scheduled for September 27, 2021, and December 6. 2021. The district court accepted that he had standing to seek the preliminary injunction under the four-part test in *Winter v. United States*, 550 U.S. 7, 20 (2008): "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Relief could have been easily fashioned since the Plaintiff's term of service had not ended. It then dismissed the Plaintiffs on the merits. Last, in *Severino*, plaintiff, a President Trump employee, was removed by President Biden from the Council of the Administrative Conference of the United States ("ACUS"). As here, the plaintiff argued that President Biden

23

lacked the statutory authority to order his removal because the enabling statute called for a fixed three-year term. That claim was rejected on the merits, but this court stated that "we have held it sufficient for Art. III standing if we can enjoin 'subordinate executive officials' to reinstate a wrongly terminated official '*de facto*,' even without a formal presidential reappointment." *Severino,* 71 F.4th at 1042–43 (quoting *Swan v. Clinton*, 100 F.3d 973, 980 (D.C. Cir. 1996)).

Each of these three cases, moreover, makes an all-or-nothing determination of standing, so that the request for relief properly embraces the claim for injunctive relief in the form of restoration to office in a return to the status *quo ante*. The most pointed determination is found in *Swan.* Robert Swan had been removed by President Clinton from his position on the Board of the National Credit Union Association, after which Clinton relied on his powers to make recess appointments to install Yolanda T. Wheat in his place. The Court of Appeals held that its finding of standing incorporated the right to receive injunctive relief against a subordinate official, by allowing its plaintiffs the kind of relief that the District Court here held that the Plaintiffs did not have standing to raise:

> We think that it would elevate form over substance in a case of this dimension not to treat Swan's complaint as if it also sought injunctive or declaratory relief against these individuals in their official capacity. Injunctive relief against Hoyle [executive director of the National Credit Union Association ("NCUA")] and these added defendants could on balance substantially redress Swan's injury and is sufficient to satisfy the

24

redressability requirement of standing. While these officials cannot officially remove Wheat and reinstate Swan, they can accomplish these deeds *de facto* by treating Swan as a member of the NCUA Board and allowing him to exercise the privileges of that office—*i.e.,* including Swan in Board meetings, giving him access to his former office, recording his votes as official votes of a Board member, allowing him to draw the salary of a Board member, *etc.*—and by denying any such treatment to Wheat.

*Id*. at 980.

All three cases—*Swan*, *Severino* and *Spicer*—agreed a return to a Board position is meaningless if it is followed by a refusal to allow this official to work in the same environment that she left. Yet that is exactly what the District Court ordered when it concluded: "A. Plaintiffs Have Standing to Challenge Only Their Removals from the Boards." App007. One implication of this statement was that the Plaintiffs "have alleged no injury caused by the authorization of subcommittees." Yet the key passage in *Swan* makes it clear that the appointment of one or more subcommittees that consist of individuals who were not proper members of the various BOVs dilutes their authority, which makes it improper for the District Court to dismiss Plaintiffs' concerns with the facile remark that these positions are "the Boards' duties are nonrivalrous—another person's performing them need not prevent the Board from performing them too." App012. No one doubts that the President or the Congress can seek advice elsewhere, but they cannot undermine the exclusive status and influence of the Board by not allowing

25

it to speak with a single voice. The point was moreover explicitly addressed in

*Swan* as follows:

> While these [DOD] officials cannot officially remove [their successors] and reinstate [them], they can accomplish these deeds *de facto* by treating [them] as members of [their respective boards} and allowing [them] to exercise the privileges of that office—*i.e.,* including [them] in Board meetings, giving [them] access to [their] former office[s], recording [their] votes as official votes of Board member[s], allowing [them] to draw the salary of a Board member, *etc.*— and by denying any such treatment to [the subsequent person named by Biden].

*Id.* at 980.

## A.    Subcommittees.

The District Court seeks to avoid just this explicit conclusion with the lame observation that to date "Plaintiffs have not alleged that any subcommittees have been actually brought into being." But that is hardly surprising since the committees have been kept dormant, and all the Trump appointees sacked. But suppose that they were brought back to life, could either the President or the Secretary of Defense make just any appointments it wanted after *Swan?* Does it make any sense to say that any question of law that can be resolved today should be held in suspense until some subcommittee is created in the future when these Plaintiffs may not be in a position to sue at all. It is not the case, therefore, that the Plaintiffs "resist identifying any injury." Restoration to the Board means here what

it means in *Swan*, restoration of all the rights, privileges and incidents of office. *Swan* also states that the injunction that issues should deny to the new person in the office that was granted properly to the disposed parties. That should apply to the Biden replacement appointments to the BOVs.

**B.    Declaratory and Injunctive Relief Against the Removal From Office.**

The District Court also held that the prohibition against awarding relief against future harms blocked the Plaintiffs' request for any more general form of declaratory or injunctive relief with respect to these suspensions, because of their failure to allege an "ongoing or imminent future injury." App008, 010. That question of declaratory relief only arose because the District Court refused to make a prompt decision when the briefing was concluded in August 2022, but waited until March 2023 to hand down its Memorandum Opinion. Of necessity, the Plaintiffs are seeking not just reinstatement, but to obtain comprehensive relief to prevent a repetition of the wrong, including those done under subterfuges, such as using the unauthorized zero based review imposed by the Secretary of Defense to shut down the BOVs without any statutory authorization, express or implied, to disrupt the routine business of the BOVs. The President obviously could have solicited whatever advice he wanted from either the sitting BOVs or outside parties without shutting the operations down. Nor did the Secretary have to delay the

completion or publication of any ZBR past the stated deadline of April 30, 2021, for the BOVs. A clear judicial condemnation of this practice would have clear precedential and institutional value by blocking future illegal maneuvers from any future administration, which could not easily be enjoined at the time. There is, of course, as the District Court noted, no imminent danger of a repetition of this precise event because the Biden administration has achieved its entire short-term objective by purging all Trump members from all BOVs. Under a tit-for-tat strategy, a Republican president could follow suit, which means that we know *today* that the entire statutory structure of independence and rotation in membership will crumple from a repetition of the petty intrigue started by the Biden administration and continued by others.

This case is thus distinguishable from cases like *Silver v. Internal Revenue Service,* 569 F.3d 5, 9 (D.D.C. 2021) where a preliminary injunction was denied in a routine tax dispute that had been already resolved once on the merits. It pointless to allow a premature award of injunctive relief when there is no reason to expect a follow-on suit. Not so in *Stirrup* where the Plaintiffs have *never* able to obtain timely redress for her injury. The present Plaintiffs do not ask for two bites at the apple; but they do insist on one. Thus in contrast to *Silver*, there was no prior litigation on the merits, so that the normal requirement of imminence is irrelevant when the institutional threat is necessarily long-term and capable of escaping

28

correction. It may be too late in the day to oust the current BOV members (whose appointment was illegal), and to restore the Plaintiffs to their seats long after their term has expired. Awarding declaratory relief avoids these knotty remedial complications while providing a clear directive that that will stop all future presidents from imitating Biden's illegal actions. The basic principle against mootness in cases "capable of repetition, yet evading review," which the District Court curtly dismisses, App009, applies with full force to these novel circumstances These issues have been fully briefed and argued. The institutional stakes are too high to sweep these matters under the carpet.

## III.    THE DISTRICT COURT ERRED ON THE MERITS WHEN IT CONCLUDED THAT THE FEDERAL ADVISORY COMMITTEE ACT DOES NOT PROTECT THE TRUMP PRESIDENTIAL APPOINTMENTS TO BOVS FROM DISMISSAL.

It is a general principle of statutory construction that no single factor determines the proper meaning of any statutory provision. There are multiple formulations of the basic rule, which uniformly state that the text (or its "plain meaning"), the purpose, the legislative history, and common interpretative practices all play a role in figuring out the proper meaning of a given statutory provision. There are indeed many difficult cases of statutory construction when these relevant factors point in different directions. But by the same token, when all the factors point in the *same* direction, their mutual reinforcement strengthens the

outcome beyond what would be the case if a single factor was treated as a litmus test. The District Court disparages this commonsense notion when it writes:

> Plaintiffs' mélange of constitutional and statutory arguments lacks analytical rigor. The Court cannot leap to decide the scope of the President's constitutional removal authority without first asking whether there is a nonconstitutional ground for deciding the case. . . . [T]he Court must first address whether the statute authorized the President to remove Plaintiffs. If it did, the inquiry is over; there is no separation-of-powers problem because Congress and the President effectively agree on whether the individual can be removed.

App016–017 (citation and quotation marks omitted). The District Court's approach to statutory interpretation is flatly wrong. The first inquiry is *not* whether the statute authorized the President's removal. Rather, it is whether the statute that purports to authorize the removal is in fact constitutional. Yet that question is never answered by the simple-minded observation that the President and the Congress have agreed on the removal question. The concurrence of the two branches of government is a *necessary* condition for a statute to become law, but it is not a *sufficient* condition, for if that were the case then no constitutional challenge could be mounted against any legislation passed proper form, including those statutes that were passed when Congress overrides a Presidential veto, if the statute violates some structural norm or individual right guaranteed by the Constitution.

### A.    The BOVs Are Not Constitutional If the President Retains the Power To Fire Prior Presidential Appointees at Will.

The correct analysis of the status of BOV members starts with an analysis of

the Appointments Clause, Art. II, § 2, cl. 2 which provides:

> [H]e shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

That clause received its authoritative interpretation in *Buckley v Valeo*, 424

U.S. 1 (1976), which stands for the proposition that under that clause all *officers* of

the United States shall be appointed either by the President, the courts, or the heads

of departments. For these purposes, the definition of an officer is a person who

exercises "significant authority pursuant to the law of the United States," *Buckley*,

424 U.S. at 12. By design, the BOV members exercise *no* authority at all, and

hence cannot be officers of the United States. Indeed *Buckley* notes that the

principle of separation of powers makes it clear that these bodies are not

constitutional as executive branch operations if *any* of their officers are appointed

by members of Congress, including the Speaker of the House or the President Pro

Tem of the Senate. Thus even if the President had (which he does not) some

31

"inherent removal authority," as wrongly claimed by the District Court, *see* App016, the entire set of advisory committees would still be *per se* unconstitutional given their improper mode of selection, no matter what the principle governs removal from the BOVs. The methods set out in the Appointments Clause are "exclusive", *Buckley*, 424 U.S. at 118, such that the members of the Federal Election Commission, clearly officers, some of whom were appointed, as here, by the President Pro Tem of the Senate and the Speaker of the House, could not hold their position because they had extensive executive authority that covered recordkeeping, disclosure, investigations, rulemaking, adjudication, and enforcement powers. *Id.* at 109–10.

The members of these three Advisory Boards have no such powers, and thus are not officers of any sort, let alone those covered by the Appointments Clause, which is why the tripartite scheme of appointments rejected in *Buckley* for officers is wholly proper here. Since these Boards do not have executive power, they can only be constitutional if their members are not executive branch officers, which they are not. Thus the only way the operation of these advisory boards can survive constitutional scrutiny is to deny the President has appointed officers pursuant to the Appointments Clause.

32

**B.    The President Cannot Remove Board Members With Term Appointments, Even If the Appointments Clause Objection Does Not Prevail, Given Their Protected Constitutional Status.**

Suppose, contrary to fact, that the Appointments Clause objection fails. The question then arises whether the President can use his implied powers to fire Board members appointed by his predecessor. He cannot. Start with the text of the statute. It provides in no uncertain terms that the sitting president of the United States shall have the power in sequence to appoint two members to the BOVs each year, as their three-year terms expire. There is not the slightest ambiguity on this language, and there is no reason to assume that the President has, as the District Court insisted, some unmentioned and unexplained "inherent power" to undo the clear statutory structure by giving him an additional power to fire at will. Thus, in the Steel Seizure Cases, *Youngstown Steel v. Sawyer*, 343 U.S. 579 (1952), the Court held that the President of the United States did not have any "inherent power" to shut down the Steel Mills, even though he was the Commander-in-Chief of the armed forces. Justice Hugo Black in the plurality opinion noted that "the President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself," *Id.* at 585, for which he found neither. There is no statutory authority to fire members of advisory boards that is in the text of the statute, which is why the District Court concocted some inherent power.

33

Where did this power come from? In this instance, the government's claim rests upon *Parsons v. United States,* 167 U.S. 324 (1897), which held correctly that the President could fire at will any district attorney appointed by either him or his predecessor under a three-year term contract. That practice is in fact utterly routine whenever a new president comes into power. These attorneys unambiguously work as officers within the executive branch, which members of these BOVs are not. Thus the District Court makes a profound error when it cites exclusively to cases of government employees when it writes that absent a "specific provision to the contrary, the power of removal from office is incident to the power of appointment." App017 (quoting *Carlucci v. Doe,* 488 U.S. 93, 99 (1988)). More specifically, the Supreme Court held that the director of the National Security Administration could remove one of his employees who worked a term contract. But that rule, and its rationale, is limited to cases involving employment contracts.

*Carlucci* in turn relies on an earlier Supreme Court decision, *In re Hennen*, 38 U.S. 230 (1839), which asked whether District Courts, which had the statutory power to appoint their respective clerks, also had the implied statutory power to remove them. Presidential power was not thereby directly implicated, but the Court nonetheless did address its scope:

> Being responsible for the manner in which these high trusts are executed, [the President] must, from the very nature of things, be at liberty to employ and dismiss at pleasure those whom he

employs as his agents. The laws, therefore, which create those departments, expressly recognize this relationship and this control. *Id* at *235*.

*Hennen*'s analysis is widely understood to state an essential feature of modern American constitutional law. See, e.g., *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014) (citing *Marbury v. Madison*, 5 U.S. 137, 176 (1803)) ("[T]he longstanding practice of the government can inform our determination of 'what the law is' in a separation-of-powers case."). Indeed, the role of these customary rules reveals the evident tension between *Parsons* and its cavalier treatment of *Marbury*. Marbury was appointed to a five-year term as a justice of the peace for the District of Columbia. Chief Justice Marshall held that Marbury could *not* be removed at will by the President of the United States since he had received a valid commission.

The overall position is clarified by an examination of the cases that follow *Parsons*. The first such case is *Myers v. United States,* 272 U.S. 52 (1926), which stands for several propositions. The key result, which no one challenges today, is that the President has the right to fire any member of his inner circles without cause. The far more controversial proposition was that he could also fire at will inferior officers who received Senate confirmation, including any Postmaster so confirmed. There is no obvious policy justification for giving the president that power that comes close to one that lets the President pick and retain his own

closest advisors. Nonetheless, Chief Justice Taft held that *Parsons* had by implication overruled *Marbury v. Madison*, which had assumed that the President could not revoke a five-year judicial appointment at will. As a chorus of academic authorities have written, Taft had to be wrong on this assertion, because the arbitrary power of removal constitutes a mortal threat to the independence of the judiciary. *See, e.g.*, Jed Handelsman Shugerman, *Presidential Removal: The Marbury Problem and the Madison Solutions,* 89 Fordham. L. Rev. 2085, 2090 (2021), which states "the first Congress understood that a fixed term of years for an office meant that either an officer could not be removed or that removal could be limited by conditions similar to requirements of high crimes and misdemeanors." That statement may be disputed in connection with inferior officers, but it undoubtedly is true for judicial appointments, whether or not Art. III judges, where independence is their key to their effective discharge of their duties. See also Jane Manners & Lev Menand, *The Three Permissions: Presidential Removal and the Statutory Limits of Agency Independence*, 121 Colum. L. Rev. 1, 24 n.137 (2021); John Manning, *Separation of Powers as Ordinary Interpretation*, 124 Harv. L. Rev. 1939, 1971 (2011), rejecting *Taft's* reading of the *"*open-ended language in *Myers.*" Note, also, that Art. III contains no explicit prohibition against the president removing any justice or judge at will, and yet such has always been

implied for judges who "shall hold their Officers during good Behaviour" in order to preserve judicial independence.

This academic criticism is borne out by the decisive rejection of Taft's unbridled presidential removal power for judges. The view that *Marbury* survived *Parsons* was explicitly adopted in Brandeis's *Myers* dissent 272 U.S. at 242-43. Thereafter, two key cases, *Humphrey's Executor v. United States,* 295 U.S. 602 (1935), and *Wiener v. United States*, 357 U.S. 349 (1957), manifestly departed from *Myers*. The first of these cases preserved the independence of administrative agencies from the executive branch. The second, relying on the first, held that President Eisenhower did not have the power to replace Truman appointees to a War Claims Tribunal, who served on three-year terms with his own nominees. Justice Felix Frankfurter wrote:

> Humphrey's case was a *cause celebre*—and not least in the halls of Congress. And what is the essence of the decision in Humphrey's case? It drew a sharp line of cleavage between officials who were part of the Executive establishment and were thus removable by virtue of the President's constitutional powers, and those who are members of a body "to exercise its judgment without the leave or hindrance of any other official or any department of the government," 295 U.S., at 625–26, as to whom a power of removal exists only if Congress may fairly be said to have conferred it. This sharp differentiation derives from the difference in functions between those who are part of the Executive establishment and those whose tasks require absolute freedom from Executive interference. "For it is quite evident," again to quote *Humphrey's Executor,* "that one who holds his office only during the pleasure of another, cannot be depended

> upon to maintain an attitude of independence against the latter's
> will." 295 U.S., at 629.

*Wiener*, 357 U.S. at 353.

Thus, the most reliable factor for drawing an inference regarding the President's power of removal in our case is the nature of the function that Congress vested in the War Claims Commission. What were the duties that Congress confided to this Commission? And can the inference fairly be drawn from the failure of Congress to provide for removal that these Commissioners were to remain in office at the will of the President? For such is the assertion of power on which petitioner's removal must rest. The ground of President Eisenhower's removal of petitioner was precisely the same as President Roosevelt's removal of Humphrey. Both Presidents desired to have Commissioners, one on the Federal Trade Commission, the other on the War Claims Commission, "of my own selection." They wanted these Commissioners to be their men. The terms of removal in the two cases are identical and express the assumption that the agencies of which the two Commissioners were members were subject in the discharge of their duties to the control of the Executive. An analysis of the Federal Trade Commission Act left this Court in no doubt that such was not the conception of Congress in creating the Federal Trade Commission. The terms of the War Claims

Act of 1948, 50 U.S.C. § 4104–47 (2018), leave no doubt that such was not the conception of Congress regarding the War Claims Commission.

The test of whether the president should have an implied power of removal rests on the question, therefore, of whether independence is needed to discharge the position to which the individual is appointment. That surely was true of members of tribunals in *Wiener*, and it is evident from the terms of FACA that such independence is required for all members of BOV, none of whom are supposed to be the president's friend. The test thus articulated by Justice Frankfurt in *Wiener* applies with full force here. The implication is against dismissal given the established need for independent and balanced advice.

Frankfurter's basic presumption is only fortified by a closer look at the basic statute, which clearly by its text precludes any inference that the President retained the at-will power of removal. The statute explicitly provides the President each year can appoint two members to the BOVs to replace the two members whose terms expired. These statutes are thus clearly distinguishable from the fixed three year term in *Parsons*, to which the principles of rotation and independence are nonexistent. But the District Court mangled the statute to achieve an illicit end. The exact text for the Air Force Board reads: "President shall designate persons each year to succeed the members designated by the President whose terms *expire that year*." 10 U.S.C 9455(b)(1) (emphasis added). The Plaintiffs who were fired

39

by President Biden did not have their terms "expire," as the District Court fancifully suggests when it writes that "[p]laintiffs fail to explain why a member's 'term of office' has not 'expired' if the President fires her." App018.

This confused passage conflates the term "fire" with "expire," even though their dictionary meanings are the opposite. Expire means "to come to an end, such as to exceed its period of validity. The contract will *expire* next month." *Expire*, *Merriam Webster Dictionary*, https://www.merriam-webster.com/dictionary/expire (last visited Sep. 6, 2023). In contrast, fired means "[t]erminating employment against the will of the worker." *Fired*, *Corporate Finance Institute*, https:// corporatefinanceinstitute.com/resources/career/fired/ (last visited Sep. 6, 2023). The District Court thus violates the most elementary rule of statutory construction, which is that words should be given their ordinary meaning unless the context requires some other meaning, which is hardly the case here. See, e.g. *Watson v. United States*, 552 U.S. 74, 76 (2007), relying on the "ordinary or natural meaning of a term." Given the language and context, it makes no sense to argue that the president may oust from office people from whom he does not want to receive advice.

The District Court knew that it was on thin ice when it backtracked from its initial equation of expire with the following: "Even if that is not the most natural reading of 'expired,' that possibility means that the term-of-office provision cannot

40

defeat the longstanding presumption." App018. But there is no such presumption with respect to BOV members after *Wiener*; only the natural verbal distinction between the two words "expire" and "fire". It is therefore incorrect to insist that given this nonexistent presumption, "Plaintiffs, former presidential appointees, must point to a specific statutory provision that prevented their firing." App017. No, the shoe is on the other foot, and the government must point to an explicit grant of that power because clearly the text leaves no room for the supposed presumption that these members can be fired at will.

The same point was hammered home in *Severino v. Biden*, 71 F.4th 1038, (D.C. Cir. 2023). That case took *Parsons* as standing for the proposition that the appointment for a particular term should be regarded "as a limitation and not a grant." It then indicated how this presumption tied into the question of statutory interpretation:

> That precedent [*Parson*] is the backdrop against which Congress legislated the Conference into being and created a three-year term for Council members. When Congress uses words "which had at the time a well-known meaning * * * in the law of this country," those words are to be understood "in that sense" absent strong contextual indicia to the contrary. *Lorillard v. Pons,* 434 U.S. 575, 583 (1978); *see also United States v. Wilson*, 290 F. 3d 347, 357 (D.C Cir. 2002) ("Congress is presumed to be aware of established practices and authoritative interpretations of the coordinate branches.") Doubly so when a contrary interpretation of statutory language would create a separation of powers issue that hewing to settled

meaning would not. We will not assume Congress picked a constitutional fight unless it makes that intent crystal clear.

This exact standing leads to the exact opposite result in this case where the statutory scheme is entirely different from that involved in *Severino*. This Court unanimously held in *Severino* that the President had the power to remove Severino from his position as a member of the Administrative Conference of the United States. That body "is a governmental entity that produces research, recommendations, and guidance on how to improve the operation of Executive Branch agencies. The Conference has no power to enforce its suggestions; its only power is to persuade." *Severino*, 71 F.4th at 1040. A Council of ten members, appointed by the President, supervises the work of the Conference," of which only five could be employees of the federal government. Unlike the BOVs involved in this case, all of the parties involved were located solely in the Executive Branch, where Art. II of the Constitution "gives the President the sole responsibility to 'take Care that the Laws be faithfully executed'" *Id.* at 1043-44 (citing U.S. Const. art. II, § 1, cl. 1). To fulfill that duty, the President generally must be able to "control[ ] those who execute the laws" on his behalf, which then gives him the absolute power to remove. *Id.* at 1044.

Note that the plaintiff was located exclusively within the executive branch, so that his case did not raise any of the separation of powers issues found under the

appointments clause, as explicated in *Buckley v. Valeo.* The only way therefore to avoid a constitutional fight over separation of powers is to note that the BOVs are subject to divided control from all three branches of government, which lets them stand by design outside that traditional tripartite structure. It is also crystal clear in this case that standard practice on presidential appointees allows them to serve out their three-year terms when they extend into the term of the next president. At this point the applicable starting point is not *Parsons* but *Wiener*: "As this Court noted in *Severino*, *Wiener* stands "on the rationale that the War Claims Commission was an adjudicatory body, and as such, it had a unique need for 'absolute freedom from Executive interference.'" 71 F.4th at 1047. The explicit guarantees of neutrality and independence that are baked into the statutory framework.

At this point, therefore, it is preposterous under *Lorillard's* presumption in favor of ordinary meaning to insist that the term "expire" means "fire" when both standard English and this particular context both suggests the exact opposite. And it piles absurdity on top of absurdity to reach that conclusion in the face of a longer uniform practice that goes exactly in the opposite direction.

The situation does not get any better when one looks at the purpose that is given for the adoption of the statute, which tracks the language in *Wiener*. Thus the FACA makes it very clear, as noted earlier, that the purpose of the statute is to make sure that the President, the branches of Congress and the public at large

43

receive sound and independent advice. Thus, the provisions state, to repeat, that the law requires that the Boards' membership be "fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee," *id.* § 1004(b)(2), and that their "advice and recommendations" will "be the result of [their] independent judgment," *id.* § 1004(b)(3). Those objectives can only be achieved if the members of the board are insulated from removal by the President, the President Pro Tem of the Senate or the Speaker of the House. If the President can remove (and ditto the President Pro Tem of the Senate and Speaker of the House), he can utterly defeat the purpose of have a balance of viewpoints, by removing, as he did here, all those Trump Board members whose values he does not like. Once that power to remove is unfettered, the BOV members would be no more independent of the president than judges who could be removed by the president at will notwithstanding the explicit provision of lifetime tenure under Art. III. The power of the President to remove officers of the executive branch does not extend to these board members because of the need to prevent the concentration of power in the hands of a single individual. The stated *purposes* of the statute are totally frustrated by the incorrect interpretation that the District Court puts on the statutory text. And Severino's reference to standard contract law cuts in exactly the opposite direction in this case. These are not "personal service

contracts." Their work is in no way supervised by the president any more than it is supervised by the President Pro Tem of the Senate or the Speaker of the House.

The District Court makes light of these structural arguments when it writes, incorrectly:

> even if Plaintiffs are right about the statute's purpose, their interpretation does not follow. The Board's job is to provide advice, and advice is only as useful as its recipient believes it to be. One could just as easily posit that fulfilling the statute's purpose requires plenary presidential removal power so that the President is guaranteed to have confidence in those dispensing recommendations, making him more likely to heed their advice. In any event, an unsupported, ill-defined notion of the statute's purpose that does not necessarily support Plaintiffs' interpretation cannot defeat the *Carlucci* presumption any more than the three textual arguments.

App020.

But the president is not the only one who has access to the report. Thus, the major error in this passage is the claim that since advice is only as useful as the recipient thinks it to be the President should have a "plenary power" to remove people whose advice he does not like. But the whole point of the independence power is to make the president and *all other parties* who read the reports listen to advice that he may *not* want to hear, and to hear it from a balanced group whose competition he cannot alter. The President is surely able and entitled to disregard that advice, even if he may have to pay a political price for so doing. And he can seek private advice from others outside the BOV structure if he so chooses,

45

including his advice from senior advisors. But he cannot fire the board because he dislikes the public advice that they give.

The limitations of the President's power are, moreover, confirmed by the uniform practice which again shows that the *Carlucci* presumption only applies to *officers* wholly in the executive branch. No president has ever fired any members of the BOVs, no matter what that President's view of the BOVs work. But at the same time it is routine to ask for the resignation of, for example, all U.S. Attorneys (as in *Parsons*) serving under term appointments because these officers are not entitled to the remedy of specific performance because no court wants to supervise those employment relationships. But that objection does not apply to members of independent boards whose independent work needs no supervision at all. So there it is: the text of the statute, the structure of BOVS, and their purpose all militate against inferring in a statute that is silent on the question any "inherent" power to dismiss. The President has no "inherent constitutional power" under the FACA to remove these officials. *Wiener*, 357 U.S. at 352. QED.

## IV.   PLAINTIFFS HAVE STATED A VALID CAUSE OF ACTION FOR BREACH OF CONTRACT.

In *United States v. Alabama G. S. R. Co.*, 142 U.S.615, 621 (1892), the Supreme Court summarized the rules of contractual interpretation as follows:

> It is a settled doctrine of this court that in case of ambiguity the judicial department will lean in favor of a construction given to

46

> a statute by the department charged with the execution of such statute, and, if such construction be acted upon for a number of years, will look with disfavor upon any sudden change, whereby parties who have contracted with the government upon the faith of such construction may be prejudiced.

Just that disfavored outcome happened here where the President sacked these members of these Boards of Visitors, without cause. Previously, President Trump made an offer to the Plaintiffs to join the BOVs, which was accepted. The terms of those contracts were spelled out in great detail under the governing statute and regulations, and established beyond a doubt that these BOVs did *not* serve under employment contracts, any more than judicial appointments are employment contracts. The terms of the contract were clear; the government breach was total and deliberate. The case is straightforward as a matter of standard legal principle.

Not, however, for the District Court which misapplied the correct principles of contract law when it claimed that the Plaintiffs "say little about their terms." App021. But Plaintiffs only needed to make the simple request to return to the status *quo ante*, where they work on the same terms as all other Board members, so there is no ambiguity in the terms. The District Court then noted that both the statutory provisions of FACA and constant practice militate in favor of Plaintiffs' position, only to reach the wrong conclusion on at will terms. It writes:

> But the statute cannot have guaranteed them three-year terms because, as the Court has already held, it permits the President to fire presidentially appointed Board members at will. For the

47

> same reason, no amount of historical practice can compel a
> contrary conclusion. *Cf.* U.C.C. § 2-208 (Unif. L. Comm'n
> 1977) ("[E]xpress terms shall control course of performance
> and course of performance shall control both course of dealing
> and usage of trade.")

App022.

The difficulties here are manifest. It was only by way of *implication* that the

District Court purported to conclude that these appointments were at will. At this

point, the general principle in U.C.C. § 2-208 of the 1977 version of the U.C.C.

cuts in the opposite direction. There is *no* express term in this agreement that gives

the president the power to fire at will. That power was read into the agreement

solely by the inaccurate extension of implication in *Carlucci*, an employment case:

"absent a specific provision to the contrary the power of removal from *office* is

incident to the power of appointment." *Id*. at 411. Hence, by treating *Carlucci* as

governing, the District Court then blithely disregarded all matters of statutory

language, structure, accumulated uniform past practice, and, course of dealing

evidence in dealing with board *members*, all of which cuts overwhelmingly in the

opposite direction.

The decisive episode in that history is recounted in Adrian Vermeule,

*Conventions of Agency Independence*, 113 Colum. L. Rev. 1163, 1199–1201

(2013), which recounts the unsuccessful efforts of then President Ronald Reagan to

remove three members of the Civil Rights Commission. The administration

48

maintained that it was free to do so, even though it never anticipated the *Buckley* appointments issue. *Id*. 1201 at n.153. But politically the President was outdone. The holdover members refused to resign, and no new appointees were approved by the Senate. The incident led to the passage of new legislation which gave the president the power to appoint four of the eight members of the Civil Rights Commission, with two each for the House and Senate. As Vermeule concluded, "The long-run effect of the episode was to cause Congress to transform the convention of the Commission into a formal legal rule." *Id*. at 1201. See, 42 U.S.C. § 1975(e), establishing the Civil Rights Commission.

That change should not be undone by unilateral administrative action. This case does not involve a request for specific performance of an employment contract so that Restatement (Second) of Contracts § 367 cmt. A (Am. L. Inst. 1981) – "A court will refuse to grant specific performance of a contract for service or supervision that is personal in nature" – is wholly inapplicable. This is not a contract for service, and there is no presidential supervision given the congressionally guaranteed independence of the BOVs.

## V.    THE PLAINTIFFS HAVE PROPERLY ALLEGED THAT THE ACTIONS OF THE PRESIDENT HAVE ABRIDGED THEIR FREEDOM OF SPEECH.

As the District Court acknowledges, viewpoint discrimination is "presumptively unconstitutional," App023, but it shies away from the implications

of that bedrock proposition, giving that the firings were made solely because of "an 'improper motive' behind their firing, the desire to purge those who are not "aligned" with the president's "values." At this point, the District Court purports to justify these presidential dismissals on the ground that none of the Plaintiffs can point to any particular statement made in the course of their duties that could count as a form of protected speech. But the claim of viewpoint discrimination does not depend on what the Plaintiffs said at any given moment—it was well known to everyone that the deposed members held points of view that the Biden administration found intolerable. As then White House Press Secretary Jen Psaki claimed, the President's reason for having Board members resign was to ensure that he had new members meeting his "qualification requirements," which included "*whether you're aligned with the values of this administration*." The White House, *Press Briefing by Press Secretary Jen Psaki, Secretary of Agriculture Tom Vilsack, and National Economic Council Director Brian Deese, September 8, 2021* (Sep. 8, 2021, 3:21 PM) (statement of Press Secretary Jen Psaki), https://www.whitehouse. gov/briefing-room/press-briefings/2021/09/08/press-briefing-by-press-secretary-jen-psaki-secretary-of-agriculture-tom-vilsack-and-national-economic-council-director-brian-deese-september-8-2021/ (emphasis added); *see* Chris Cameron, *White House Forces Out Trump Appointees From Boards of Military Academies*, *New York Times* (Sept. 8, 2021), https://www.nytimes.com/2021/09/08/us/politics/

50

trump-appointees-military-academy-boards.html. Clearly, they were not removed for any reason of purported incompetence, but solely to deny them a platform to express views that the Biden administration feared would gain influence in the political arena. To be sure, the Plaintiffs could all speak after they were removed, but without the platform to which they were legitimately entitled.

At this point it is quite irrelevant for the District Court to claim: "Their complaint contains no suggestion that they have faced impediments to saying anything they wish, and it concedes that they have not tried to speak on any particular topic. So they have not stated a viewpoint-discrimination claim." But what Plaintiffs have alleged is decisive. They were removed solely because of their views, and therefore have lost their places on the BOVs as a direct sanction against their behavior and therefore have been unable to express their views as members of the BOVs. In this case the BOV members are not like ordinary employees in *Connick v. Myers*, 461 U.S. 138 (1983), where the government can restrict employees public on matters of public interest. But no such constraints apply to independent members of the BOVs. The effort to deny these Plaintiffs their legitimate platform is a *per se* illegal effort to stifle public participation on matters of "political, social, or other concern of the community," *Connick*, *id* at 146, when there is not the slightest worry that these members have used, or will use their platform to undermine the integrity of public institutions, which is just not present

51

here. At this point the freedom of speech claim completes the circle. Both it, and the right of BOV members to regain their position given by contract stem from the overwhelming imperative of the law to preserve their intellectual freedom and independence needed for the BOVs to discharge their statutory duties.

## VI.    IN LIGHT OF THE MULTIPLE AND REPEATED VIOLATIONS COMMITTED BY THE BIDEN ADMINISTRATION THE NECESSARY AND ONLY WORKABLE REMEDY IN THIS CASE IS A PERMANENT INJUNCTION THAT BARS ALL FUTURE PRESIDENTS FROM FIRING SITTING MEMBERS OF THE BOVS DURING THE TERM OF APPOINTMENT.

The final inquiry in this case must determine the remedy for the Biden administration's repeated violations of constitutional, statutory and regulatory norms. In the ordinary case the correct remedy is the restoration of the Plaintiffs to their terms of office, as if the violation had not taken place. But in this instance the delay in legal enforcement makes that impossible as their terms have already expired before any redress was given. Indeed, even the most timely intervention could not restore the time lost between the commission of the wrong and the imposition of the remedy.

It does not follow, however, that this case should be regarded as one with a deliberate breach for which there is no judicial remedy either in law or equity. The requirement of standing explicitly notes that redressability must be flexibly applied

in order to avoid creating a constitutional vacuum where rights are blatantly violated and courts must stand mutely to one side.

In this instance, the option of awarding damages in this case is strained because all BOV members serve without compensation as part of their civic obligations to their country, so that any damage award is contrived and in any event allows for a repetition of the same usurpation of presidential power. At this point, the real danger is that if these Plaintiffs are left remediless, the BOV structure is wholly destroyed, because there would be no way to prevent the current President or any future president from engaging in the same illegal behavior, knowing that the vicissitudes of litigation will allow any future Administration to run out the clock on any pending violations, allowing the same violations to occur repeatedly. Yet it would be dangerous and foolhardy for any court to confess that the claim is moot, given that this regrettable episode is one that is "capable of repetition, yet evading review."

Once it is recognized that the high-handed actions of the Biden Administration meets these conditions, this Court should conclude that appropriate remedy is a nationwide injunction that prohibits all Presidents from engaging in the dismissals of any Presidential appointees from any such BOV. No lesser remedy will stop the abuse. Yet it is a remedy that is easy to implement because it does not, unlike an order of specific performance of any employment contract, require the

Court to supervise the day-to-day operations of the BOVs, which is beyond its power on any reasonable reading of the statutes. Individual redress is beyond the power of this Court, but the ability to prevent a total breakdown of the current institutional arrangements lies within its judicial power to correct. At this point the redress is systematic, not individual, which in the long run is what matters most for the stability of American public institutions.

## CONCLUSION

The decision of the District Court should be reversed on both standing and the merits, so that this Court issues a declaratory judgment that declares the illegality of the administration's dismissals of the Plaintiffs from their positions. The District Court should be instructed to fashion effective remedies to prevent a repetition of the illegal actions by any President who seeks by arbitrary dismissals to undermine the principles of personal independence and rotation in office that undergird the FACA.

Respectfully submitted,

/s/ Jeffrey E. McFadden
LAW OFFICES OF
JEFFREY E. MCFADDEN, LLC
312 Prospect Bay Drive East
Grasonville, MD 21638
Phone: (443) 272-4737
jmcfadden@jmcfaddenlaw.com

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 13,000 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because, this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman.

/s/ Jeffrey E. McFadden

Attorney for:  Appellants

Date:  September 8, 2023

A